[No. B169043. Second Dist., Div. Four. Aug. 10, 2004.]

In re KASAUNDRA D., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
KASAUNDRA D., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part I of the Discussion.

## COUNSEL

Cheryl Barnes Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Victoria B. Wilson and Jennifer A. Jadovitz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CURRY, J.—** ██ Appellant Kasaundra D. contends that in a situation where two or more Welfare and Institutions Code[1] section 602 juvenile petitions charging a minor with criminal misconduct are filed under the same superior court case number, an order terminating jurisdiction issued by the judicial officer presiding over proceedings on two petitions requires proceedings on the other petition to cease. For the reasons discussed, we agree.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

#### The Three Petitions

Appellant, born in July 1982, was brought before the juvenile court on three separate petitions, one filed May 16, 1997 (Petition 1); one filed June 20, 1997 (Petition 2); and one filed September 10, 1999 (Petition 3).

---

[1] Unless otherwise specified, all statutory references are to the Welfare and Institutions Code.

[2] For reasons that are not clear, the clerk's transcript prepared for this appeal does not contain all of the superior court file. Appellant attempted to augment with selected orders and reports, but we found it necessary to call up the entire superior court file in order to fully understand the relevant background.

Petition 1 alleged that appellant had committed two counts of second degree robbery in violation of Penal Code section 211 and personally used a knife (Pen. Code, § 12022, subd. (b)(1)). According to the probation officer's report, the crime involved an attempt to take bags of Halloween candy from two trick-or-treaters by physical force and display of a knife tucked in appellant's waistband. The petition was amended in June 1997 to allege misdemeanor grand theft (Pen. Code, § 487, subd. (c)), through personal use of a knife. Appellant admitted the allegations of the petition, as amended.

Petition 2 alleged that appellant committed battery (Pen. Code, §§ 242, 243, subd. (a)) and vandalism (Pen. Code, § 594, subd. (a)(2)) against her aunt and her aunt's home. On July 23, 1997, both counts in the petition were sustained.

On August 12, 1997, the juvenile court aggregated the sentences on Petitions 1 and 2, and ordered appellant to participate in the Camp Community Placement Program for one year and four months. On January 26, 1998, appellant was furloughed from camp. On July 6, 1998, the court ordered the camp furlough release terminated on the ground there was no available relative with whom appellant could reside or who could supervise her. Appellant was ordered "suitably placed," and the probation officer was to evaluate the parents' home for placement. On July 19, 1999, appellant was placed in her parents' home. On October 18, 1999, appellant's mother informed the court that appellant refused to come home and was living with her grandmother. The court in Department 261 issued a warrant for her arrest (the October warrant).

A month earlier, on September 10, 1999, Petition 3 had been filed, charging appellant with attempted robbery (Pen. Code, §§ 664, 211) and assault with a deadly weapon (again a knife) by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(1)). A warrant was issued for her arrest on that date by Department 264 (the September warrant).

### Order Terminating Jurisdiction

Apparently, little was done to enforce either warrant in the ensuing years. Appellant's case came up for regular review in Department 261, and by orders dated January 14, 2000, and January 12, 2001, the court ordered the October warrant to remain in full force and effect. The orders were in harmony with contemporaneous probation officer reports that pointed to the existence of Petition 3 and the September warrant to support the recommendation that the court retain jurisdiction for purposes of further proceedings on the October warrant and Petitions 1 and 2.

On January 11, 2002,[3] however, the probation officer noted that appellant had remained in the community unsupervised for two years without being rearrested, and that her date of birth meant that she was 19 years old and outside the jurisdiction of the juvenile court. Based on those facts, the report recommended that the October warrant be recalled and juvenile court jurisdiction terminated. Having reviewed and signed the report, by order dated January 11, 2002, the court in Department 261 recalled the October warrant, and checked the boxes on the form order entitled "Jurisdiction Terminated" and "No outstanding Warrants found in review of case file." The superior court case file was thereupon stamped "Jurisdiction Terminated."

Similar review procedures took place in Department 264 with respect to the September warrant. On September 8, 2000, and September 7, 2001, the court ordered that warrant to remain in full force and effect. Then, on September 6, 2002, the probation officer recommended recalling the September warrant and terminating jurisdiction for the same reasons set forth in the January 11, 2002, report: appellant's age and the fact she had been in the community for two years without being rearrested. The probation officer's recommendation was rejected in Department 264. By order dated September 6, 2002, the court ordered the September warrant to remain in full force and effect.

*Nunc Pro Tunc Order and Motion to Dismiss*

Appellant was located and arrested in April 2003, and brought to court to face charges on Petition 3. In an order dated April 25, 2003, the court in Department 264 issued an order recalling the September warrant, and stating: "The minute order dated 1-11-02 in Dept. 261 is ordered amended nunc pro tunc by deleting: ['](X) Jurisdiction Terminated.[']"

Petition 3 was set for adjudication on May 14, 2003. At that hearing, the court granted a continuance so that the defense could prepare a motion to dismiss for lack of jurisdiction. At the hearing that followed, the court explained: "the way the system is set up, we have one court file for all of the minor's cases, . . . every new petition that is filed . . . comes under one court number" and that the court in Department 261 "should have more closely considered what it was doing." The court expressed the belief that Department 261 terminated its own jurisdiction only "since [this] case was not before them, even though they knew about it." The court further expressed

---

[3] The report's date is actually written as "1-11-01" but the signature at the bottom indicates it was prepared and filed in 2002.

the view that the court in Department 261 acted "in excess of jurisdiction" and that its termination of jurisdiction meant nothing "in terms of an unanswered, unresponded to petition." The court gave defense counsel an opportunity to file a written brief. After briefing, the motion was formally denied, the court once again expressing the belief that "the order made in the other court has no [e]ffect on this case whatsoever."

*Petition 3 Adjudication*

At the adjudication, the following evidence was presented: Prosecution witness Phil Williams testified that on April 30, 1999, he received a late night call from appellant to bring her food. Williams had met appellant approximately two months previously and spoke with her frequently. He was then age 36 and appellant was 16, although she had told Williams she was 18. When he arrived at appellant's house with food, another girl was there. Appellant asked for money. Williams refused, and she threw his wallet into the bedroom. When Williams went to retrieve it, appellant and the other girl followed him. The two girls closed the door and placed heavy dressers in front of it. They threw bottles and other items at Williams. Appellant asked Williams to strip. She picked up a 12-inch knife and poked him with it on his neck, back, and arms. He was not injured. Williams pushed the dressers away and got out of the room. Appellant followed, and inflicted minor damage on Williams's car.

Appellant, testifying on her own behalf, stated that she had known Williams for about two or three months prior to the incident. He called her every day. He often gave her money or presents. He would occasionally try to hug or kiss her. Appellant testified that on the night in question it was Williams who pushed a dresser in front of the door when they were alone in her bedroom, and tried to engage her in sexual activity. Specifically, Williams indicated an interest in being penetrated by a candle appellant had carved into a phallic object. Appellant attempted to comply, but was unsuccessful. Williams grabbed at her, and she threw an object at him and ran away.

The court placed more credence on Williams's version of events. Based on that testimony, the court concluded that there had been an assault with a deadly weapon, but dismissed the attempted robbery charge. Appellant was committed to the California Youth Authority for four years.

## DISCUSSION

Appellant contends that the January 11, 2002, order lawfully terminated juvenile court jurisdiction over her and precluded the 2003 adjudication of Petition 3. Appellant further contends that the court erred in issuing the nunc

pro tunc order of April 25, 2003, which purported to correct the January 11, 2002, order by eliminating the words "Jurisdiction Terminated."

I*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II

We now turn to the question of whether the court in Department 264 could properly ignore the order terminating jurisdiction in Department 261 as having "no [e]ffect on [Petition 3] whatsoever."

Despite recent laws geared toward shifting minors who commit violent crimes to adult court (see, e.g., Gang Violence and Juvenile Crime Prevention Act of 1998 (§ 707, subd. (d)); § 602, subd. (b)), it is important to keep in mind that the primary goal behind maintaining separate courts and procedures for adults and minors is to ensure that juvenile offenders who have not yet become hardened criminals receive treatment and rehabilitation. "The juvenile court system and the adult criminal courts serve fundamentally different goals. The punishment for serious crimes tried in the criminal courts is imprisonment, and 'the purpose of imprisonment for crime is punishment.' (Pen. Code, § 1170, subd. (a)(1).) . . . [¶] In contrast, the juvenile court system seeks not only to protect the public safety, but also the youthful offender. . . . [E]ven for the most serious offenders—those who will be committed to the California Youth Authority—'community restoration, victim restoration, and offender training and treatment shall be substituted for retributive punishment and shall be directed toward the correction and rehabilitation of young persons who have committed public offenses.' " (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 593 [117 Cal.Rptr.2d 168, 41 P.3d 3], Kennard, J., dissenting; see § 203 ["An order adjudging a minor to be a ward of the juvenile court shall not be deemed a conviction of a crime for any purpose, nor shall a proceeding in the juvenile court be deemed a criminal proceeding"].)

█ The difference in how juvenile and adult offenders are treated is reflected in the basic jurisdictional statute, which states that a person who violates a state or federal law or local ordinance while under the age of 18 "is within the jurisdiction of the juvenile court," and may be adjudged "a ward of the court." (§ 602, subd. (a).) A juvenile court's responsibility toward a

---

*See footnote, *ante*, page 533.

"ward" has been compared to a Probate Code guardianship. (See, e.g., *In re Dargo* (1948) 86 Cal.App.2d 114, 117 [194 P.2d 34] ["A proceeding . . . to have a minor declared a ward of the juvenile court is not a 'criminal' proceeding. It is not a proceeding in which a minor is 'charged with' or 'convicted of' a public offense. It is a proceeding 'more in the character of a guardianship whereby the minor is relieved of the stigma of a criminal conviction by placing him upon probation with individuals or in institutions having the facilities to give him corrective care, supervision and training' "]; *In re Magnuson* (1952) 110 Cal.App.2d 73, 75 [242 P.2d 362] ["[Juvenile] proceedings are for the benefit and protection of the minor when such protection is needed by the occurrence of causes for wardship, as set forth in the pertinent code sections. The result of a declaration of wardship, far from being a conviction of crime, is more in the nature of a guardianship such as is provided for in the Probate Code"].)

The governing statutes compare a juvenile court's responsibility to that of a parent: "When the minor is removed from his or her own family, it is the purpose of this chapter to secure for the minor custody, care, and discipline as nearly as possible equivalent to that which should have been given by his or her parents. . . . [¶] . . . Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances." (§ 202, subds. (a), (b); see *In re Magnuson, supra,* 110 Cal.App.2d at p. 75 ["The control exercised by the court and by the persons or agencies in whose immediate custody the ward may be placed is akin to the former parental control for which it is a substitute"].)

■ There can be no question that the goals of treatment and rehabilitation are better served if the minor's case history is dealt with as a whole, with each new offense committed by the minor used as a basis for reevaluation of the prior disposition. Not surprisingly, therefore, it has long been the practice to file successive juvenile petitions under a single case number. (See, e.g., *Moore v. Superior Court* (1913) 22 Cal.App. 156, 159 [133 P. 990].) Two modern courts have said that the use of a single case number for consecutive petitions has only "clerical" or "record keeping" significance. (*In re Arthur S.* (1991) 228 Cal.App.3d 814, 819 [279 Cal.Rptr. 69]; *In re Maurice H.* (1980) 107 Cal.App.3d 305, 315 [166 Cal.Rptr. 213].) We do not see it that way. Filing multiple petitions against a juvenile under a single case number has important practical considerations. It allows the court to keep track of the minor's progress (or lack thereof), to determine whether ordered rehabilitative programs are succeeding or failing and whether new ones should be

tried, and to aggregate offenses in order to extend the maximum term of confinement for a new offense where the minor appears to be sliding toward incorrigibility. (See *In re Michael B.* (1980) 28 Cal.3d 548, 554 [169 Cal.Rptr. 723, 620 P.2d 173]; *In re Ernest R.* (1998) 65 Cal.App.4th 443, 449 [76 Cal.Rptr.2d 453].)

It is also a basic precept of juvenile law that rulings issued with respect to one petition can have profound impact on other petitions. In *In re Dennis J.* (1977) 72 Cal.App.3d 755 [140 Cal.Rptr. 463] (*Dennis J.*), three section 602 petitions were filed against the minor in 1975 for relatively minor crimes. The petitions were sustained, but before the juvenile court could make dispositional orders, a new section 602 petition was filed charging him with rape, burglary, and robbery. A hearing was held on the latter petition, and the minor was found to be unfit for handling by the juvenile court. He pled guilty and was sentenced in adult court. Thereafter, the juvenile court disposed of the three earlier petitions by committing him to the Youth Authority. The issue on appeal was whether the juvenile court could continue to exercise jurisdiction over the minor after the finding of unfitness. The court concluded that "[s]ince . . . the juvenile court, in the exercise of its discretion, determined that [the minor] was not a proper subject for any of its programs, including Youth Authority commitment, and since that determination was made in the light of his entire background, it was error for it to retain jurisdiction over matters which were part of that background in attempting to augment the actions of the adult court. [¶] . . . When the juvenile court determines that wardship is no longer necessary it should terminate its jurisdiction." (*Dennis J.*, at p. 762.)

Similar reasoning was utilized in a different factual situation in *In re Shanea J.* (1984) 150 Cal.App.3d 831 [198 Cal.Rptr. 228], where three juvenile petitions were filed against a single minor in October 1981, June 1982, and August 1982. In November 1981, a fitness hearing was held in conjunction with the first petition, and the minor was found to be unfit. The second petition was adjudicated and sustained in juvenile court in 1982. A few days later, the minor was found to be unfit for purposes of the third petition. Contrasting *Dennis J.*, where "the determination of unfitness was made on the last of three petitions filed against the minor," the appellate court expressed the belief that "where the first determination of unfitness was made seven months before this petition was even filed, the lack of jurisdiction over [the minor] should have been even more obvious to the juvenile court." (*Shanea J., supra,* at p. 838.)

The holding in *Dennis J.* was superseded by statute as discussed in *In re Ivan T.* (1999) 76 Cal.App.4th 624, 630–632 [90 Cal.Rptr.2d 588] (*Ivan T.*). Section 707.01, added in 1994, provides in relevant part: "If a minor is found an unfit subject to be dealt with under the juvenile court law pursuant to Section 707, then . . . [t]he jurisdiction of the juvenile court with respect to any *previous adjudication* resulting in the minor being made a ward of the juvenile court that did not result in the minor's commitment to the Youth Authority shall not terminate, unless a hearing is held . . . and the jurisdiction of the juvenile court over the minor is terminated." (§ 707.01, subd. (a)(1), italics added.) The court applied the statute to a situation very similar to that in *Dennis J.*, holding that the juvenile court properly retained jurisdiction over pending matters after the minor was found not to be fit for purposes of a new crime and an adult criminal court found him guilty of robbery and burglary.

*Ivan T.* and section 707 do not apply in the present case. Both deal with the impact of a judicial determination of unfitness in a later filed petition on a previously adjudicated petition. The Legislature carved out an exception for that situation so that the juvenile court could continue to exercise jurisdiction over juvenile petitions *adjudicated prior to* the time the minor became fit only for adult court. There is nothing inherently inconsistent in concluding that a minor should be tried in adult court for offenses committed when he is older, but retaining juvenile jurisdiction for purposes of earlier acts.

In the present case, however, as in *In re Shanea J.*, *supra*, 150 Cal.App.3d 831, the finding that juvenile court jurisdiction should be terminated occurred with respect to the *earlier* filed petition. The court in department 261 reviewed all of the facts and circumstances, and, knowing that Petition 3 had been filed but never adjudicated, based its decision on (1) the fact that appellant had not been arrested since the incident described in Petition 3 occurred in September 1999, more than two years prior to the date of its order; and (2) the fact that appellant had turned 19. To allow a second judicial officer to look at the same facts and reach an opposite conclusion concerning jurisdiction—and then proceed to disposition on the ground that the first judicial officer "should have more closely considered what it was doing"— would undermine the integrity of final judicial rulings. (See *In re Alberto* (2002) 102 Cal.App.4th 421, 428 [125 Cal.Rptr.2d 526] ["[B]ecause a superior court is but one tribunal, an order ' " ' " "made in one department during the progress of a cause can neither be ignored nor overlooked in another department" ' " ' "].) If respondent was unhappy with the ruling terminating jurisdiction in Department 261, it should have followed orderly procedures for appellate review rather than seek a different ruling in Department 264. The January 11, 2002, order terminating jurisdiction precluded further action on a petition filed prior to its date.

## DISPOSITION

The orders issued by the court on April 25, 2003, June 2, 2003, and June 3, 2003, are reversed.

Epstein, Acting P. J., and Hastings, J., concurred.