# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee,*

v.

JUVENILE MALE,
           *Defendant-Appellant.*

No. 07-50107

D.C. No.
CR-06-02713-JAH

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
John A. Houston, District Judge, Presiding

Argued and Submitted August 9, 2007
Filed June 12, 2008
Vacated January 13, 2009
Reargued and Resubmitted April 30, 2009
Pasadena, California

Filed January 26, 2010
Amended February 8, 2010

Before: Marsha S. Berzon and Sandra S. Ikuta,
Circuit Judges, and James K. Singleton,*
Chief District Judge.

Per Curiam Opinion;
Partial Concurrence and Partial Dissent by Judge Berzon

---

*The Honorable James K. Singleton, United States District Judge for the District of Alaska, sitting by designation.

2167

**COUNSEL**

Leila W. Morgan, Deputy Federal Defender, and Kris J. Kraus, San Diego, California, for the defendant-appellant.

Christopher P. Tenorio, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

---

**ORDER**

The opinion filed on January 26, 2010 is amended to include Judge Berzon's concurrence in part and dissent in part.

---

**OPINION**

PER CURIAM:

R.P., a male juvenile, appeals from a proceeding in which he was found to be a juvenile delinquent based on violations of 8 U.S.C. § 1324(a)(1)(A)(ii) (transporting illegal aliens in the United States) and § 1324(a)(2)(B)(ii) (bringing illegal aliens to the United States for "commercial advantage or private financial gain"). He contends that the juvenile information should have been dismissed because the government violated certain provisions of the Juvenile Justice and Delinquency Prevention Act of 1974, Pub.L. No. 93-415, 88 Stat. 1109, 1133-38 (codified at 18 U.S.C. §§ 5031-5042), ("JDA") with regard to the institution of proceedings against him in federal court, his interrogation and arraignment, and the timeliness of his trial. He also appeals from the district court's judgment on the § 1324(a)(2)(B)(ii) counts, maintaining that there was insufficient evidence that he obtained or aided another in obtaining "commercial advantage or private financial gain." Because we conclude that § 5033 of the JDA was

violated, we remand to the district court to consider whether the violations were a cause of R.P.'s confession.

## BACKGROUND

### I. Statutory Protections for Arrested Juveniles.

Under the Juvenile Delinquency Act, juveniles are entitled to distinct procedural protections with regard to interrogation and arraignment, the speed with which they are brought to trial, and the institution of delinquency proceedings against them in federal court. Upon the arrest of a juvenile, the arresting officer must "immediately advise [the] juvenile of his legal rights, in language [that is] comprehensi[ble] to a juvenile." 18 U.S.C. § 5033. The arresting officer must also "notify the parents, guardian or custodian of the rights of the juvenile," and the juvenile must "be taken before a magistrate judge forthwith." *Id.*

Before instituting delinquency proceedings in federal court, the "Attorney General" must "certif[y] to the appropriate district court" that one of three conditions exists: "the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction"; "the State does not have available programs and services" for juveniles; or "the offense charged is a crime of violence" or a specified drug-related felony. *Id.* § 5032. The Attorney General must also certify that "there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." *Id.*

Lastly, a juvenile who is detained pending trial must be "brought to trial within thirty days from the date upon which such detention was begun," unless "additional delay was caused by the juvenile or his counsel, consented to by the juvenile and his counsel, or would be in the interest of justice in the particular case." *Id.* § 5036.

**II.    November 19, 2006 Arrest**.

R.P. was arrested by federal border patrol agents on November 19, 2006, at approximately 5:00 p.m. on suspicion of smuggling aliens into the United States. R.P. and the other occupants of the blue Dodge Ram in which he was traveling were then transported to the Calexico Border Patrol Station. At the station, Border Patrol Agent Jesus Salazar asked R.P. his birth date. R.P. stated that he was born on January 18, 1988, making him 18 years old. Agent Salazar was informed by his dispatcher, however, that DHS records[1] showed a number of earlier arrests for R.P., and that the birth dates given on at least two of those occasions would make R.P. a juvenile on the day of this latest border-crossing. Neither Agent Salazar nor any of the other border patrol officers attempted to notify the Mexican Consulate or R.P.'s parents of R.P.'s arrest.

Sometime after 12 a.m., Agent Salazar advised R.P. of his *Miranda* rights and began a videotaped interview. In the interview, R.P. stated that he was a citizen of Mexico and that he had no documents allowing him to legally enter or remain in the United States; that he met a smuggler in the Mexican city of Mexicali who offered to smuggle him into the United States for $1900; and that he later agreed to drive a vehicle carrying illegal immigrants into the United States in exchange for a reduction of his smuggling fee to $500.

**III.    Proceedings Before the Magistrate Judge**.

R.P. challenges the timeliness of his trial under the speedy trial provision of the JDA, 18 U.S.C. § 5036. We therefore lay out the course of the district court proceedings in some detail.

On November 21, 2006, at least 36 hours after his arrest on November 19, 2006, R.P. was arraigned on a complaint

---

[1]DHS "maintains information on every INS apprehension." *United States v. Parga-Rosas*, 238 F.3d 1209, 1211 (9th Cir. 2001).

charging him with illegal transportation of aliens in violation of 8 U.S.C. § 1324. At the arraignment, appointed defense counsel informed the court that "[defendant] is a minor, that he's 17 years old, and that just about 20 days ago he was actually turned over to the Mexican consulate in San Luis and then taken to the Mexican authorities as a juvenile." Defense counsel presented no documents at that time to confirm R.P.'s age. The magistrate judge set a hearing date on the matter of R.P.'s juvenile status for December 1.

At the start of the December 1 hearing, defense counsel requested a continuance because the Mexican consulate had not yet interviewed R.P. The magistrate judge set the hearing for December 5, and indicated to defense counsel that evidence "that [R.P.] was previously removed as a juvenile" would likely not be sufficient to convince him that R.P. was a juvenile. However, the magistrate judge stated that verifying documents and testimony from the Mexican Consulate as to their authenticity would "lend[ ] a lot more credibility" to R.P.'s claim that he was a juvenile.

At the December 5 hearing, defense counsel stated that she had obtained faxed copies of R.P.'s birth certificate and the birth certificate of his mother by contacting R.P.'s mother in Mexico. Defense counsel also represented that a defense investigator was prepared to testify that he had contacted R.P.'s mother and obtained copies of the documents. The court informed defense counsel that "I'll just give you a tentative [ruling] that the birth certificate alone is not going to satisfy the Court without some other testimony," and that a faxed birth certificate "with the testimony that somebody spoke to somebody on the telephone" was not "going to suffice." The court decided to "give both sides [time] to prepare their cases," and set the hearing for December 11.

At the December 11 evidentiary hearing, R.P.'s fourth appearance before the magistrate judge, defense counsel informed the court that "the hearing obviously can't go for-

ward at this time," because the Mexican consulate had not "yet received the birth certificate or other documentation," and no consular officer was available to testify. The magistrate judge then set the hearing for December 20, but noted that "that's going to be 30 days out," and stated "I do think there is a certain urgency that should be given this proceeding since it is age-determinative in how [R.P.] is treated."

When the hearing reconvened on December 20 the magistrate judge informed counsel that R.P. was not present because he had been transferred to San Diego. Defense counsel stated that she had with her R.P.'s birth certificate and a Mexican consular official who was prepared to testify, and that R.P.'s mother was on standby over the phone. Defense counsel also indicated that she wished to waive R.P.'s appearance. The government objected to the waiver, and the court refused to waive R.P.'s appearance, instead setting a hearing date for December 26.

Defense counsel and the magistrate judge then proceeded to discuss which party bears the burden of demonstrating juvenile status and what type of proof would suffice to demonstrate that R.P. was a juvenile. The magistrate judge indicated that it is "the [d]efense burden to prove that this individual is a juvenile," because he "identified himself originally" as an adult, and further stated "there's a presumption that he's an adult." The magistrate judge did not say precisely what the defense burden was, but informed defense counsel, "[y]ou're going to have to . . . convince me," and that a birth certificate "in itself would not be sufficient" because "you can get anything in Mexico that you want to pay for." He would consider it "pretty good evidence," however, if someone from the Mexican consulate testified as to the birth certificate's authenticity.

The evidentiary hearing on R.P.'s juvenile status was finally conducted on December 26. The magistrate judge opened the hearing by telling the government "I think you

have the initial burden." The government presented the testimony of Agent Salazar, who identified R.P. and testified that R.P. had provided a birth date of January 18, 1988 at the time of his arrest. When he was asked by government counsel whether he had received additional information from his dispatcher regarding other arrests for R.P., Agent Salazar maintained that the birth dates R.P. had given upon his other arrests were "consistent" with the birth date R.P. provided to him. After Agent Salazar's testimony, the magistrate judge stated "I think the burden has shifted to the [d]efense now." The defense then called the Mexican consular official, who testified that he had contacted R.P.'s mother in Mexico and that she had provided an original copy of his birth certificate indicating his date of birth as January 1, 1989, as well as a residence letter from their county of residence. The consular official testified that, based on this evidence, he believed that R.P. was a minor. He also noted that R.P. had been returned as a juvenile to Mexico in October, 2006 through the Mexican consulate in Yuma, Arizona. The magistrate judge then found, based on the "credible evidence" provided by the defense, that R.P. was a juvenile.

The government filed a juvenile information the next day, alleging that R.P. had committed acts of juvenile delinquency. Counts One, Three, and Five of the information alleged violations of 8 U.S.C. § 1324(a)(2)(B)(ii),[2] including aiding and abetting that crime; Counts Two, Four, and Six alleged violations of 8 U.S.C. § 1324(a)(1)(A)(ii),[3] including aiding and abetting that crime.

---

[2]8 U.S.C. § 1324(a)(2)(B)(ii) provides that:

Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien . . . shall . . . in the case of . . . an offense done for the purpose of commercial advantage or private financial gain . . . be fined under Title 18 and shall be imprisoned . . . .

[3]8 U.S.C. § 1324(a)(1)(A)(ii) provides that:

Any person who . . . knowing or in reckless disregard of the

The same day, the government filed two additional documents. The first document, titled "Certification" and signed by United States Attorney Carol C. Lam, states that "the juvenile court of the State of California does not have jurisdiction over the above-referenced juvenile defendant" and "that there is a substantial federal interest in the case to warrant the exercise of federal jurisdiction." The second document, which is not dated, is entitled "Juvenile Delinquency Certification" and is signed by John Weis, an Assistant United States Attorney. On the document, a box has been checked next to the statement "Contacted Joseph Beard, Assistant District Attorney, Imperial County State Juvenile Court, who declined prosecution."

## IV.   Pre-Trial Proceedings Before the District Court.

At the first motion hearing before the district court on January 4, 2007, R.P. moved to dismiss the information on the ground that he had been detained for more than thirty days without being brought to trial, in violation of 18 U.S.C. § 5036. The court held that the speedy trial clock begins to run from the time a defendant is determined to be a juvenile by the court, not when the court is first put on notice that defendant may be a juvenile, and that there therefore was no violation of § 5036. The court then set a hearing on pre-trial motions for January 8.

On January 8, defense counsel filed motions to dismiss the information for failure to provide a proper juvenile certification under 18 U.S.C. § 5032; to suppress R.P.'s statements as the fruit of the government's failure to comply with 18 U.S.C.

---

fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law . . . shall be punished as provided in subparagraph (B).

§ 5033; and to dismiss the information for failure to comply with § 5033. The defense also renewed its motion to dismiss the information for failure to comply with the speedy trial provision of 18 U.S.C. § 5036. Both defense counsel and the government requested additional time to respond to motions and prepare for trial, and the court set a trial date of January 18, 2007. At the pre-trial hearing on January 18, the court addressed defense counsel's motions and held that there was no violation of § 5033, the JDA provision regarding arrest and interrogation of juveniles, that would require either suppression of R.P.'s statements or dismissal. The court concluded that § 5033 "was not triggered at the time of arrest" because R.P. "gave an adult date of birth." The court again held that there was no violation of the speedy trial provision of the JDA, § 5036 but delayed ruling on the question whether certification was proper under § 5032.

## V.  Trial.

At trial, the government presented testimony from border patrol agents and from aliens who were passengers in the blue Dodge Ram. Two of the Border Patrol Agents who participated in R.P.'s arrest identified R.P. as the driver of a blue Dodge Ram that was pulled over on November 19, 2006 with illegal aliens inside, and testified that he attempted to evade border patrol officers, first by swerving into oncoming traffic and later by running from the vehicle after it came to a stop. In addition, Agent Salazar testified that, after R.P. was transported to the Calexico Border Patrol station, he took R.P.'s biographical information and found that he had six previous arrests, during some of which he had given birth dates that would indicate that he was a juvenile on November 19, 2006. Agent Salazar also testified to the contents of R.P.'s statement.

Material witnesses Neftali Sanchez-Moreno, Javier Tomas Hernandez-Alvarez, and Javier Peralta-Mendoza testified about their transportation to the United States. Sanchez-

Moreno and Hernandez-Alvarez both testified that they agreed to pay a smuggler $1500-2000, and that they followed the smuggler's instructions to travel from Mexicali to Algodones and to then set out walking on a road, at which point they were picked up by a blue truck. Peralta-Mendoza testified that he traveled to Mexicali with his brother, where they waited in a hotel until a man came and met them and gave his brother instructions. He and his brother then took a bus to Algodones, and from there walked into the desert where a blue truck picked them up. Peralta-Mendoza testified that his father was going to pay for him to be smuggled into the United States.

After the government rested, defense counsel moved for acquittal under Federal Rule of Criminal Procedure 29(a) on Counts One, Three, and Five, arguing that the government failed to provide sufficient evidence of an intent to receive "financial gain," and also renewed the motion to suppress R.P.'s statement as obtained in violation of § 5033. The court denied the motion to suppress, holding that "the defendant was properly advised of his rights per *Miranda* as an adult," and denied the Rule 29 motion. The district court next addressed the motion to dismiss due to faulty certification under § 5032. The court held that the certification complied with § 5032 because the attached document signed by an Assistant United States Attorney was essentially a "declaration" indicating that the United States Attorney's office had conducted the investigation required by the statute.

Pronouncing its judgment, the district court held that R.P. was a juvenile delinquent with respect to all counts. With respect to Counts Two, Four, and Six the court found that R.P. knowingly drove a vehicle of undocumented aliens into the United States. Regarding Counts One, Three, and Five, the court further found that R.P. agreed to drive the vehicle to reduce his smuggling fee, and that this reduction constituted financial gain. The court also inferred from the evidence that R.P. knew that the other occupants of the vehicle were

paying a smuggler. The court subsequently sentenced R.P. to ten and one-half months imprisonment and a term of supervised release that expires on his twenty-first birthday.

## ANALYSIS

### I. Certification Provision of the Federal Juvenile Delinquency Act (18 U.S.C. § 5032).

[1] R.P. argues that the government did not properly certify the case as required by 18 U.S.C. § 5032,[4] because the certification signed by the U.S. Attorney inaccurately stated that the California state court did not have jurisdiction over the juvenile for the crime at issue, rather than that it had refused jurisdiction. The statute indicates that, in a case in which federal court jurisdiction is premised on a lack of state court jurisdiction, the U.S. Attorney must certify one of two things: (1) that the state court does not have jurisdiction, or (2) that the state court has refused jurisdiction.[5]

In this case, the U.S. Attorney submitted a signed certification stating that "the juvenile court of the State of California does not have jurisdiction over [R.P.] with respect to the

---

[4]18 U.S.C. § 5032 provides, in relevant part:

A juvenile alleged to have committed an act of juvenile delinquency . . . shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense charged is a crime of violence that is a felony or an offense described in [certain federal statutes].

[5]The certification cannot be signed by an Assistant U.S. Attorney, only by the U.S. Attorney herself. *See United States v. Doe*, 98 F.3d 459, 460-61 (9th Cir. 1996).

charged offenses of Bringing in Illegal Aliens for Financial Gain under [8 U.S.C. § 1324(a)(2)(B)(ii), and aiding and abetting that crime], and Transportation of Illegal Aliens and aiding and abetting [that crime] under [8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II)]." Also submitted, apparently on the same day, was a second, undated form signed by an Assistant U.S. Attorney and entitled "Juvenile Delinquency Certification," on which a checkmark was placed next to the typed statement: "Contacted Joseph Beard, Assistant District Attorney, Imperial County State Juvenile Court, who declined prosecution." We conclude that the certification did not violate 18 U.S.C. § 5032 because the state court did not have jurisdiction over R.P. within the meaning of the statute.[6]

[2] The government and R.P. both initially assumed that, because the Assistant District Attorney in fact "declined prosecution," a substantively accurate certification would have indicated that the state court *refused* jurisdiction, not, as the certification stated in this case, that the state court did not *have* jurisdiction. According to R.P., this substantive inaccuracy in the certification rendered it invalid and deprived the district court of jurisdiction. But both parties failed to note that the second alternative of subsection (1) of the statute refers to the decision by the state court, not the state prosecutor, to "refuse[ ] to assume jurisdiction." 18 U.S.C. § 5032. When a state prosecutor in California declines to initiate proceedings against a juvenile in a California state court, the state court never obtains jurisdiction over the particular juvenile and thus has no occasion to refuse it.[7]

---

[6]It is not contended that Joseph Beard did not have the authority to speak for the Office of the District Attorney. As we shall see, California law gives the District Attorney authority to determine which cases will proceed to court and in so doing determines which court, and in fact, if any California court, will have jurisdiction over a particular charge against a particular juvenile.

[7]We assume, for purposes of our analysis, that had a prosecution been brought a California state court could have exercised jurisdiction over R.P.

**[3]** Here, the state prosecutor affirmatively declined to initiate prosecution. The Assistant U.S. Attorney's statement so asserts, and, while the statement cannot serve as the statutorily required certification, it provides evidence, which is not disputed, of two factors relevant to the U.S. Attorney's certification: 1) that the requisite investigation had been performed by the U.S. Attorney's Office, and 2) that the investigation established that the state prosecutor responsible for any juvenile proceeding had affirmatively declined to institute such a proceeding. In this set of circumstances, determined after an appropriate investigation, the U.S. Attorney's certification that "the juvenile court . . . does not have jurisdiction" is accurate.

Our conclusion that the certification is consistent with the Assistant U.S. Attorney's report that the Assistant District Attorney "declined prosecution" rests upon two pillars:

First, the term "jurisdiction" is not defined in 18 U.S.C. § 5031 (Definitions) or elsewhere in the governing statutes. Thus, to determine its meaning in § 5032 we must look to the language of the statute, assuming that legal terms are used in their usual sense. *See Dolan v. U.S. Postal Service*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."); *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human*

---

under the California Welfare & Institutions Code, which provides that "any person who is under the age of 18 years when he or she violates any law of this state *or of the United States* . . . is within the jurisdiction of the juvenile court." (Cal. Welf. & Inst. Code § 602(a) (emphasis added).) *See also In re Jose C.*, 198 P.3d 1087 (Cal. 2009). In other words, a California court would have subject matter jurisdiction over a pending proceeding involving R.P. But because no state court proceeding regarding him was ever initiated, such available subject matter jurisdiction was never invoked and no California court ever acquired jurisdiction.

*Resources*, 532 U.S. 598, 615 (2001) ("Words that have acquired a specialized meaning in the legal context must be accorded their legal meaning."). Absent a more specific statutory definition, "[j]udicial jurisdiction implies the power to hear and determine a cause . . . ." *United States v. O'Grady,* 89 U.S. 641, 647 (1874). In addition, § 5032 specifies that the jurisdiction certified must be exercised "over said juvenile" and "with respect to such alleged act of juvenile delinquency." The word "over" and the phrase "said juvenile" indicates that "the power to hear and determine a cause" must have come into existence — be "over" — a particular person — "said juvenile." The reference to "such alleged act of juvenile delinquency" reinforces the conclusion that § 5032 is concerned with an extant — rather than inchoate — authority of the court to decide a specific, existent case, concerning a particular alleged illegal act.

Further reinforcing this interpretation of the term "jurisdiction" in § 5032 is the reference to the "court refus[ing] to assert jurisdiction." Courts may not, of course, relinquish their authority to decide classes of cases generally but, in some circumstances, may relinquish their authority over a particular case sought to be brought before them. *E.g., R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941).

**[4]** All of these linguistic considerations, then, support the conclusion that for purposes of § 5032, the reference to a state court's "jurisdiction . . . over said juvenile with respect to such act of juvenile delinquency" refers to the court's authority with regard to the particular juvenile and a specific alleged illegal act. General subject matter jurisdiction over classes of juveniles or classes of acts is insufficient.

Second, although federal law determines the meaning of the term "jurisdiction" in § 5032, we must look to the law of the affected state to determine whether its courts "have jurisdiction over [R.P.] with respect to such alleged act of juvenile delinquency. . . ." 18 U.S.C. § 5032. In other words, we must

look to whether the juvenile courts of California had the power to decide this case involving R.P.[8]

As we have seen, the California courts clearly have subject matter jurisdiction over claims that a juvenile violated federal criminal immigration laws even if no specific California statute addresses the same conduct. Cal. Welf. & Inst. Code § 602(a); *see also In re Jose C.*, 198 P.3d at 1095-96. R.P. argues that this conclusion determines the matter. He is in error. As we have explained, the fact that certain "crimes" are within the subject matter jurisdiction of a California court does not mean that a specific California court has the power to hear and determine particular charges against a specific individual. Thus, the question becomes: Did the juvenile court or other appropriate court of California acquire the authority to determine whether R.P. violated federal immigration law?

**[5]** California views this question as one concerning the separation of powers. The California Constitution divides governmental powers among the legislative, executive and judicial branches. Cal. Const. art. III, § 3. In the view of the Supreme Court of California, the legislature determines which acts shall be deemed criminal and grants the courts subject matter jurisdiction. The executive (in the person of the district attorney) is given discretion to determine which individuals shall be charged with offenses; until charges are brought no court acquires jurisdiction over a violation of law. Only once charges are filed do the courts acquire jurisdiction over the particular case. Thereafter, the determination of charges is a judicial function. *See Manduley v. Superior Court,* 41 P.3d 3, 13 (Cal. 2002); *Davis v. Municipal Court*, 757 P.2d 11, 24

---

[8]Our conclusion may not be determinative in a state where the bringing of charges by the prosecutor is not necessary to give a juvenile or other appropriate state court jurisdiction over a particular juvenile for a specific alleged illegal act. *See United States v. Juvenile*, 599 F. Supp. 1126 (D. Or. 1984) (concluding that under Oregon law prosecutor did not have ultimate authority to refuse to prosecute juvenile in state court).

(Cal. 1988) (noting that "the jurisdiction of a court is invoked and a judicial proceeding initiated" only when "an accusatory pleading is filed").

**[6]** In this case, no charges were ever brought against R.P. in any California court. Consequently, no California court ever acquired jurisdiction over him, *e.g.*, no California court ever acquired the power to determine whether *R.P.* had illegally crossed the border in violation of the laws of the United States. Thus, the certification by the U.S. Attorney was correct: no California court had "jurisdiction over [R. P]," who was "said juvenile."

R.P. presents a number of arguments seeking to avoid this result. We briefly address those arguments. First, he argues that it is fundamental that parties may not by stipulation grant a court jurisdiction that it would not otherwise have. But R.P. is misled by ambiguities in the term "jurisdiction." Where the legislature has denied a court subject matter jurisdiction, the parties may not, of course, grant it by stipulation. But a plaintiff may always prevent a court from having jurisdiction over a particular civil case by determining not to file a claim and so failing to file it; courts have no authority to reach out to decide cases never brought before them. Similarly, a prosecutor may prevent a court from acquiring jurisdiction over a criminal matter by deciding not to file charges and so not filing them.

Second, R.P. argues that this solution ignores Congress's preference for state responsibility for juveniles where state proceedings are available. R.P. misunderstands the law. Section 5032 requires the U.S. Attorney to investigate and determine whether the matter is going forward in state juvenile (or other appropriate) court. If so, federal authorities must step aside. The Department of Justice's Criminal Resource Manual implements this responsibility appropriately, directing that "[i]n cases of concurrent jurisdiction, the appropriate local prosecutor should be briefed on the facts of the case, and a

determination made as to whether he/she is accepting or refusing prosecutorial responsibility in the matter." U.S. Dep't of Justice, United States Attorneys' Manual, tit. 9, Criminal Resource Manual § 41. If the prosecutor does "accept . . . prosecutorial responsibility," and the state court acquires jurisdiction, the matter remains in state court unless state charges are for some reason dismissed, i.e., the state court refuses to assert jurisdiction. *See United States v. T.M.*, 413 F.3d 420, 424-25 (4th Cir. 2005) (where a state court initially assumes jurisdiction over a juvenile but later dismisses the case, it has "refused" to retain jurisdiction, thus satisfying § 5032). Then federal prosecution may go forward. This procedure fully implements § 5032's preference for federal abstention in favor of state court juvenile adjudication. *See Untied States v. Sechrist*, 640 F.2d 81, 84 (7th Cir. 1981).

California recognizes that where there is concurrent jurisdiction between state and federal courts regarding criminal matters, the California constitution gives the prosecutor discretion to consent to the case proceeding in federal court, thus denying state courts jurisdiction. *Manduley,* 41 P.3d at 18. This permission is part of the general California rule that gives the prosecutor, as part of his charging decision, the power to control which, if any, of the available state forums will receive the case. *Id.*

Finally, R.P. objects that our interpretation makes the language "or refuses to assume jurisdiction" redundant. We do not agree. Like the "does not have jurisdiction" clause, the "refuses" clause also applies to "the juvenile court or other appropriate court of a State," not to a prosecutor, and refers to "jurisdiction." *See* 18 U.S.C. § 5302. So the "refuses" clause refers at least to situations in which a state court has the option not to hear a juvenile case and exercises that option, *see T.M.*, 413 F.3d at 424-25; whether there are other circumstances covered as well we do not decide.

[7] In sum, we hold that the U.S. Attorney can certify to the absence of state court jurisdiction under 18 U.S.C. § 5032 if

he learns that the appropriate state prosecutor has decided not to prosecute a particular juvenile for the specific crime at issue.

## II.   The Speedy Trial Provision of the Juvenile Delinquency Act (18 U.S.C. § 5036).

**[8]** R.P. also alleges a violation of the speedy trial provision of the JDA, 18 U.S.C. § 5036, which requires trial of detained juveniles within 30 days of the start of their detention, absent certain exceptions. We hold that there was no violation of the JDA's speedy trial provision because R.P. caused the delay in the start of his trial by lying about his age.

**[9]** It is now established that the speedy trial clock "begins to run at the commencement of federal detention of the juvenile on the federal delinquency charge." *United States v. Doe*, 366 F.3d 1069, 1070 (9th Cir. 2004) (en banc) ("*Doe I*"). *Doe I* also specifies that the detention must be "on the charge of alleged delinquency," so that "unrelated federal detention" does not cause the clock to run "before federal authorities became aware of the facts giving rise to a charge of delinquency." *Id*. at 1074.

The government and R.P. disagree about when the relevant "federal detention" began for purposes of the speedy trial clock. The government argues that the district court correctly held that the speedy trial clock only begins to run once a determination has been made that an individual is a juvenile, because it is only at that point that the juvenile becomes an "alleged delinquent." R.P. contends instead that the clock begins to run from the moment federal detention begins on the underlying acts that form the basis for the juvenile delinquency charge. *Doe I* did not address whether "unrelated federal detention" includes, as the government contends, detention as an adult for the same underlying act, or whether an ultimate determination that an individual is a juvenile is one of the "facts giving rise to a charge of delinquency" that

must occur before the speedy trial clock begins to run. *Id.* at 1074 (citing *United States v. Juvenile Male*, 74 F.3d 526, 528-29 (4th Cir. 1996) (holding that federal immigration detention prior to being charged with an act of delinquency did not start the speedy trial clock)). We need not resolve these questions, however, because even if the clock began to run at the moment R.P. was first taken into custody on November 19, there was no violation of the Act.

[10] The JDA speedy trial provision excludes from the 30-day limit delay that is (1) "caused by the juvenile or his counsel," (2) "consented to by the juvenile and his counsel," or (3) "in the interest of justice in the particular case." 18 U.S.C. § 5036. We have held that delays occasioned by motions of defense counsel are "caused by the juvenile or his counsel." *See United States v. Baker*, 10 F.3d 1374, 1397 (9th Cir. 1993), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000).

[11] One of our sister circuits has held that delay occasioned in part by a juvenile lying about his age is excludable as either consented to or caused by the juvenile. In *United States v. Romulus*, 949 F.2d 713 (4th Cir. 1991), the actual date on which the juvenile was taken into federal custody was unclear, but he was brought before a magistrate judge on July 2, 1990, at which time he provided a false birth date and a false name. *Id.* at 714-15. Only on July 3, 1990 did the government determine his true name and age. *Id.* at 715. The Fourth Circuit held that "because the government was unaware that Romulus was a juvenile until July 3, 1990 . . . any period of time prior to July 3 was properly excluded as delay caused by the juvenile." *Id.* at 716. *See also United States v. Doe*, 49 F.3d 859, 866 (2d Cir. 1995) (excusing a delay was in the interest of justice where "Doe's misrepresentations as to his age and identity, defense counsel's tactical delay . . . , and his extending that delay beyond 30 days in hopes of gaining a dismissal with prejudice" were the cause).

**[12]** This case is slightly different from *Romulus*, because the government — here, Agent Salazar — was on notice from the DHS records that R.P. might be a juvenile. Still, in this case, as in *Romulus*, R.P. created the need for proceedings to determine his juvenile status by lying about his age. Thus, the time spent in determining R.P.'s age is excludable as delay caused by the juvenile.

Applying these principles to this case, there was no JDA speedy trial violation once the excludable time is removed. R.P. was arrested on November 19, 2006 and placed in federal custody. His trial began on January 18, 2007, 60 days after he was arrested. The period from January 8-18 is excludable as caused by the juvenile or his counsel, because it was brought about by the filing of pre-trial motions by the defense. The period from November 21, when defense counsel first provided notice to the court of R.P.'s alleged juvenile status, to December 20, when defense counsel first appeared with an original copy of R.P.'s birth certificate and a witness from the consulate, is also excludable, as delay caused by the juvenile. The passage of time was necessary to make a determination of R.P.'s juvenile status, and the need for that determination resulted from his false response when first asked his date of birth.[9]

R.P. argues that it took until December 26 to determine that he was a juvenile only because the judge inappropriately put the burden of proof on him to show that he was a juvenile and refused to consider an uncertified birth certificate from Mexico. As a result, the defense argues, no portion of the time from December 5, when a copy of the birth certificate was

---

[9]The District Court may have erred in refusing to waive R.P.'s appearance at the December 20 hearing, making the delay from December 20-26 not excludable. That period does not matter, however, because even if it is not excluded, it is insufficient to make the period of delay not caused by R.P. greater than 30 days. We therefore assume for purposes of our analysis that the time is not excludable.

first proffered, to December 26, when R.P. was finally determined to be a juvenile, should be excluded.

**[13]** The record shows, however, that no delay was caused by a failure correctly to apply the burden of proof. There is a paucity of cases addressing the appropriate allocation of the burdens and standard of proof in a hearing to determine juvenile status, and the statute itself is silent on the question. Having reviewed the available cases from other circuits and the district courts, we are persuaded that the government bears the initial burden of proving defendant's age and "must offer prima facie evidence of defendant's adult status." *United States v. Salgado-Ocampo*, 50 F. Supp. 2d 908, 909 (D. Minn. 1999). We also conclude that, as has been suggested by the Second Circuit, a previous statement from the juvenile that he is an adult can constitute such prima facie evidence. *See United States v. Alvarez-Porras*, 643 F.2d 54, 66-67 (2d Cir. 1981). The burden then shifts to the defense to "come forward with evidence of his juvenile status," and the government then has an opportunity "to rebut with any additional information." *See Salgado-Ocampo*, 50 F. Supp. 2d at 909.

**[14]** Here, the magistrate judge correctly applied these burdens. At the ultimate hearing on December 26, the court appropriately required the government to present prima facie evidence of R.P.'s age, and appropriately treated R.P.'s own previous statements as such evidence. Only then did the judge require that R.P. come forward with proof to rebut that presumption. Similarly, the requirement imposed by the judge at earlier hearings that R.P. come forward with evidence was simply an appropriate application of the shifting burdens.

R.P. further argues that, even if his statements constituted prima facie evidence of his adult status so as to shift the burden to the defense, the defense presented sufficient evidence of juvenile status by December 5, so that the time from December 5 through December 26 is excludable. He argues, in particular, that the copied birth certificate should have been

admissible, without authentication through consular testimony. The question, however, is not the admissibility of the birth certificate but rather the weight to be accorded it. The magistrate judge was not compelled to find that the copied, unauthenticated birth certificate was sufficient to show that R.P. was a juvenile.

[15] We conclude that the time from January 8 through 18 and from November 21 through December 20 is excludable. As a result, the government was responsible for only 21 days of the delay in bringing R.P. to trial as a juvenile. We therefore affirm the district court's refusal to dismiss the information for failure to comply with § 5036.[10]

## III.    Warning, Notification, and Arraignment Requirements of the JDA (18 U.S.C. § 5033).

R.P. alleges that the district court erred in failing to suppress his statements or dismiss the information despite the government's failure to comply with § 5033. He argues that when an arresting officer is aware of conflicting information about an arrestee's age, the officer is obligated to comply with the requirements of § 5033. The government argues, in contrast, that it is not obligated to comply with those requirements when, as happened here, the juvenile indicates that he is an adult.

---

[10]We note with some concern that Agent Salazar's testimony before the magistrate judge in the pretrial proceedings was seriously misleading as to whether R.P. had ever provided juvenile birth dates in the past. Agent Salazar testified in the pretrial proceedings that the information he received from DHS records was "consistent" with the adult birth date that R.P. provided on November 19, 2006. He did not indicate until trial that some of the birth dates previously provided by R.P. would have made him a juvenile.

Agent Salazar's misleading testimony, however, did not lead to a delay in R.P.'s trial. Salazar testified for the first time on December 26, 2006, at which time the magistrate judge found that R.P. was a juvenile. The delay prior to December 26, 2006 was thus caused by R.P.'s provision of an adult birth date, not by the misleading testimony of Agent Salazar.

We agree with R.P. that the government was obligated to comply with the requirements of the JDA, but for a somewhat different reason. We conclude that under the plain language of the statute, the determinative factor in the application of § 5033 is whether the arrestee is in fact a juvenile, regardless of whether he indicates that he is an adult. Because R.P. was, as the district court ultimately determined, a juvenile at the time of his arrest, he was entitled to the protections of § 5033.

**[16]** "In interpreting a statute, we look first to [its] plain language." *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999) (*quoting Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 830 (9th Cir. 1996)). Section 5033 provides that:

> Whenever a juvenile is taken into custody for an alleged act of juvenile delinquency, the arresting officer shall immediately advise such juvenile of his legal rights, in language comprehensive to a juvenile, and shall immediately notify the Attorney General and the juvenile's parents, guardian, or custodian of such custody. The arresting officer shall also notify the parents, guardian, or custodian of the rights of the juvenile and of the nature of the alleged offense.
>
> The juvenile shall be taken before a magistrate judge forthwith. In no event shall the juvenile be detained for longer than a reasonable period of time before being brought before a magistrate judge.

Section 5033 begins "*[w]henever* a juvenile is taken into custody . . . ." (Emphasis added). On its face, then, the statute does not allow for exceptions in situations in which an officer has no reason to know of an individual's juvenile status or in which the juvenile lies about his age. Instead it requires that its protections be provided "*[w]henever* a juvenile is taken into custody."

A comparison of § 5033 to other provisions of the JDA suggests that Congress did not intend § 5033 to contain an exception for instances in which a juvenile lies about his age. Section 5036 of the JDA specifically provides an exception for instances in which delay "was caused by the juvenile or his counsel," while § 5033 contains no such language regarding failure to provide the protections of § 5033. Congress could have included similar language in § 5033, excusing compliance with the requirements of § 5033 when the juvenile himself hinders the government's compliance, but it did not.

Nor is there any support in the language of the statute for a requirement that the protections of § 5033 apply only when an arresting officer reasonably should have known that an arrestee was a juvenile. The United States Code contains numerous civil and criminal provisions that are triggered only when an individual or the government "reasonably should have known" a particular fact. *See, e.g.*, 18 U.S.C. § 983(e)(1)(A) (a person entitled to written notice in any civil forfeiture proceeding may file a motion to set aside a declaration of forfeiture if "the [g]overnment knew, or reasonably should have known, of the moving party's interest and failed" to provide notice); 26 U.S.C. § 4975(f)(11)(B)(ii) (an exemption for certain otherwise prohibited transactions is not available if the person knew "or reasonably should have known" that the transaction was prohibited). Had Congress wished to make the protections of § 5033 turn on whether the arresting officer had reason to know that an individual was a juvenile, it could have done so. The plain language of the statute thus compels the conclusion that juveniles are entitled to the protections of § 5033 whenever they are taken into custody, regardless of the information available to police officers about the juvenile's age.

The use of the phrase "alleged act of juvenile delinquency" does not change this conclusion. A "juvenile" by definition can only be arrested for an "alleged act of juvenile delinquen-

cy"; the statute would be plainly inconsistent if it read "[w]henever a juvenile is taken into custody for an alleged [crime]." *See* 18 U.S.C. § 5031 (" '[J]uvenile delinquency' is the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult . . . ."). Although a juvenile may be transferred to adult court when certain requirements are met and there convicted of a "crime," such a transfer cannot occur prior to arrest or arraignment. *See* 18 U.S.C. § 5032 (delineating requirements and standard for transferring a juvenile to criminal prosecution). More importantly, the language of the phrase does not require that the officer realize that the arrestee is in custody for an "alleged act of juvenile delinquency" rather than a "crime." Thus, "alleged act of juvenile delinquency" does not introduce any ambiguity about whether an arresting officer must know that an individual is a juvenile before the statutory protections apply.

"When we find the terms of a statute unambiguous, judicial inquiry is complete except in rare and exceptional circumstances." *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991). We may only reject the application of the statute as written if it "will produce a result 'demonstrably at odds with the intentions of its drafters.' " *Id*. at 190-91 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)); *see also Middle Mountain Land & Produce, Inc. v. Sound Commodities, Inc.*, 307 F.3d 1220, 1223 (9th Cir. 2002). Not only is there no evidence in this case that application of the unambiguous text of the statute will lead to a result in conflict with the intentions of Congress, there are a number of reasons Congress might have concluded that precisely such a bright line rule is preferable.

[17] Congress did not indicate expressly in any of its reports on the JDA its reason for adopting the language of § 5033. The legislative history of the JDA does, however, reflect that Congress meant substantially to increase the procedural safeguards available to juveniles immediately after

their arrest. The JDA was intended, among other things, to "provide basic procedural rights for juveniles who come under Federal jurisdiction and to bring Federal procedures up to the standards set by various model acts, many state codes and court decisions." S. Rep. No. 93-1011, *reprinted in* 1974 U.S.C.C.A.N. 5283, 5284. Congress's purpose was thus to "provide for the . . . constitutional safeguards fundamental to our system of justice." *United States v. Female Juvenile, A.F.S.*, 377 F.3d 27, 36 n.18 (1st Cir. 2004) (quoting S. Rep. No. 93-1011, reprinted in 1974 U.S.C.C.A.N. at 5312).

As this purpose suggests, the Act was adopted in part in response to the Supreme Court's decision in *In re Gault*, 387 U.S. 1 (1967), in which the Court emphasized that juvenile delinquency proceedings "must measure up to the essentials of due process and fair treatment." *Id*. at 30 (quoting *Kent v. United States*, 383 U.S. 541, 562 (1966)). *See also United States v. Doe*, 155 F.3d 1070, 1076 (9th Cir. 1998) (the 1974 JDA amendments "were intended to guarantee certain basic procedural and constitutional protections to juveniles as required by *Gault*") (internal quotation marks omitted). *Gault* focused in particular on police interrogation of juveniles, noting that "the greatest care must be taken to assure that" any confessions obtained as a result of interrogation are not the "product of ignorance of rights or of adolescent fantasy, fright or despair." 387 U.S. at 55.[11] Strengthening procedural protections for juveniles before and during interrogation was thus a key purpose of the Act.

Given this emphasis on strong procedural protections, there are several reasons Congress might have believed that requir-

---

[11]A recent study of 200 known exonerations based upon DNA evidence concludes that 31 cases involved false confessions, 12 (39%) of which were made by juveniles. Out of the 200 known exonerations, 22 (11%) involved juveniles. Thus, 12 out of 22 of the juveniles exonerated (55%) had initially provided confessions that proved to be false. Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55, 65, 89 (2008).

ing the protections of § 5033 "[w]henever a juvenile is taken into custody" is preferable to a rule allowing for exceptions based on the information provided by the juvenile. As the Supreme Court has repeatedly emphasized, a child is less capable than an adult of understanding the consequences and seriousness of arrest and detention. A juvenile:

> is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights.

*Gallegos v. Colorado*, 370 U.S. 49, 54 (1962); *see Bellotti v. Baird*, 443 U.S. 622, 635 (1979) (noting that "minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them"). The likelihood that juveniles will not appreciate the significance of detention underlies this circuit's conclusion that a juvenile cannot waive the protections of the JDA. *See United States v. Juvenile, L.M.K.*, 149 F.3d 1033, 1035 (9th Cir. 1998) (holding that "the statute does not permit the juvenile to waive notification"); *see also United States v. D.L.*, 453 F.3d 1115, 1123 n.6 (9th Cir. 2006) (noting, "because [the issue] is likely to recur, that it is highly doubtful that a juvenile can waive consular notification"). Congress could have believed that a juvenile should also not be able to waive the JDA interrogation protections by lying about his age. The very premise of the JDA, indeed, is that juveniles will often make choices — including the choice to appear to be adults when they are not — that are not in their own interest.

Congress might also have concluded that the practical consequences of a rule that permits of no exceptions are more desirable than the consequences of, for example, a rule that

would require courts to determine what information was available to the arresting officer. The strict rule adopted by Congress should, as a practical matter, induce arresting officers initially to treat an arrestee as a juvenile if there is some basis for doing so — for example, the arrestee's appearance, information about past arrests, or some other indication. The bright-line rule builds in the likelihood that arresting officers will evaluate all the available information and, when in doubt, treat the arrestee as a juvenile. The result would be a de facto reasonable knowledge rule, while at the same time avoiding difficult post-hoc judicial line drawing concerning whether or not a sufficient quantity of evidence existed to trigger juvenile protections.

Finally, Congress may have concluded that compliance with the requirements of § 5033 is an effective way to determine quickly whether an individual is in fact a juvenile. Prompt notification of an individual's parents and, if relevant, the consulate should immediately reveal information confirming or refuting the individual's juvenile status. And bringing the individual before a magistrate judge promptly will allow the judge to make a determination as to juvenile status as quickly as possible. Here, several hearings and the speedy trial dispute might well have been avoided had the arresting officers, faced with conflicting information as to R.P.'s age, informed his mother or the Mexican Consulate of his arrest.

[18] Our discussion of the legislative history and identification of sensible justifications for the statute's clearly stated rule shows that this is not "one of those rare cases" when application of the plain language of the statute is "demonstrably at odds with the intentions of its drafters." *See Demarest*, 498 U.S. at 190. There is no evidence in the legislative history that Congress did not intend the protections of § 5033 to apply "[w]henever a juvenile is taken into custody," nor is the result of application of the statute's unambiguous text "so

bizarre that Congress could not have intended it." *Id*. at 191 (internal quotation marks omitted).[12]

[19] For the foregoing reasons, we conclude that juveniles must be provided with the protections of § 5033 "[w]henever [they are] taken into custody," regardless of the evidence available to officers at the time of arrest about the individual's age. As R.P. was a juvenile at the time of his arrest, he was entitled to the protections of § 5033 of the JDA. We therefore proceed to the question whether § 5033 was violated.

## A.   Application of § 5033.

[20] In analyzing a claim under § 5033, we "must first 'address whether the government violated the requirements of' " § 5033. *D.L.*, 453 F.3d at 1120 (quoting *United States v. Doe*, 862 F.2d 776, 779 (9th Cir. 1988) ("*Doe II*")). The government bears the burden of showing compliance with § 5033. *United States v. C.M.*, 485 F.3d 492, 499 (9th Cir. 2007). If

---

[12]In adopting the bright-line rule, we recognize that a juvenile could theoretically be encouraged to lie about his age in an attempt to mislead the government into violating the JDA. But, as we explain shortly, to obtain relief based on a violation of § 5033, a juvenile must demonstrate not only that the statute was violated but that he was prejudiced by the government's failure to comply with the statute. To manipulate the protections of the statute, then, a juvenile would have to be at once sophisticated enough to know that the law requires compliance with § 5033 regardless of whether he lies (and to ensure that the police do not, despite the lie, promptly determine that he is a juvenile through other means), and unsophisticated enough to fail to invoke his *Miranda* rights and to provide a confession that is prejudicial to him at trial. The combination is unlikely, so unlikely that the theoretical possibility of such maneuvering could not persuade us to ignore the statute's language and structure.

The bright-line rule could also lead to arresting officers erring on the side of contacting the parents of arrestees who are actually adults, with the result that the parents of some adult arrestees may be notified over their childrens' objections. Such errors, however, are likely to result in swiftly ascertaining that the arrestees are in fact adults, allowing the arresting officers to dispense with the special protections accorded juveniles.

§ 5033 was violated, we have generally then turned to the question " 'whether the government's conduct was so egregious as to deprive [the juvenile] of his right to due process of law.' " *D.L.*, 453 F.3d at 1120 (quoting *Doe II*, 862 F.2d at 779). If the government's conduct denied the juvenile due process, then the conviction must be reversed. *United States v. Wendy G.*, 255 F.3d 761, 765 (9th Cir. 2001).[13] If we do not reverse based on a due process violation, we "consider[ ] whether 'the violation was harmless to the juvenile beyond a

---

[13]Because we conclude that R.P.'s confession was prejudicial to him at trial, *see infra* at 2203, we need not decide whether the violations of § 5033 constitute due process violations. We note, however, as the issue is likely to recur, that our cases on the relationship between constitutional due process and the JDA have become somewhat confused. A number of our cases suggest that when a violation of the JDA rises to the level of a constitutional due process violation reversal is automatic, while violations that transgress the JDA alone are only a basis for relief when there is prejudice. *See, e.g.*, *D.L.*, 453 F.3d at 1120; *United States v. Juvenile (RRA-A)*, 229 F.3d 737, 744 (9th Cir. 2000); *L.M.K.*, 149 F.3d at 1035; *Doe II*, 862 F.2d at 780-81. This result does not accord with the analysis of due process claims in other contexts, in which a showing of prejudice is often required. *See, e.g.*, *Hernandez-Gil v. Gonzales*, 476 F.3d 803, 808 (9th Cir. 2007) ("In due process challenges, there must be a showing of prejudice.") (quoting *Colindres-Aguilar v. INS*, 819 F.2d 259, 261-62 (9th Cir. 1987)).

The interaction of due process and the JDA was first discussed in *United States v. Doe*, 701 F.2d 819 (9th Cir. 1983) ("*Doe III*"). In *Doe III*, we noted that failure to notify a juvenile's parents might in some cases constitute a due process violation under *Gault* if it prevented a juvenile's parents from having adequate notice of their child's hearing. *See Doe III*, 701 F.2d at 822; *see also Gault*, 387 U.S. at 33. *Doe III* suggests that a juvenile may not need to demonstrate prejudice when his parents are never provided with notice of a hearing on the merits. 701 F.2d at 822. The origin of the JDA due process cases thus suggests that reversal of a conviction for a violation of the JDA in the absence of a showing of prejudice may be appropriate only in those limited circumstances in which the violation denies a juvenile or his parents entirely the ability meaningfully to participate in his trial. Under these circumstances, it is impossible to assess what the likely impact of participation would have been.

Due process violations that prejudice a defendant are, of course, a basis for relief regardless of whether they are also violations of the JDA.

reasonable doubt.' " *D.L.*, 453 F.3d at 1120 (quoting *Doe II*, 862 F.2d at 779) (quotation marks and alteration omitted).[14] If the violation did prejudice the defendant, we have "discretion to reverse the conviction or order other more limited remedies so as to ensure that the 'prophylactic safeguard for juveniles not be eroded or neglected.' " *Wendy G.*, 255 F.3d at 765 (quoting *RRA-A*, 229 F.3d 744).

Section 5033 contains several distinct requirements. First, officers must "immediately" inform the arrested juvenile of his rights, in language that is comprehensible to him. 18 U.S.C. § 5033. Second, officers must immediately contact the

[14]The "harmless beyond a reasonable doubt" standard is not usually applied to non-constitutional violations. *See, e.g.*, *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc) (holding that where there has been a nonconstitutional error, we must reverse "unless there is a 'fair assurance' of harmlessness or, stated otherwise, unless it is more probable than not that the error did not materially affect the verdict"). In an order amending our decision in *L.M.K.*, we noted that we normally apply a "more probable than not" standard for cases involving nonconstitutional error. 166 F.3d 1051, 1051 n.1 (9th Cir. 1999) (internal quotation marks omitted).

Moreover, in articulating the harmless beyond a reasonable doubt standard for the first time, *Doe II* relied on *Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988), and *United States v. Indian Boy X*, 565 F.2d 585 (9th Cir. 1977), neither of which apply a harmless beyond a reasonable doubt standard to a non-constitutional error. *See Doe II*, 862 F.2d at 779; *Nova Scotia*, 487 U.S. at 256 (holding that, "at least where dismissal is sought for nonconstitutional error," an error is not harmless when it "substantially influenced" the outcome or "if there is grave doubt" (internal quotation marks omitted)); *Indian Boy X*, 565 F.2d at 592-93 (holding that "the proper standard to be applied is whether it is more probable than not that the error was harmless"). Nonetheless, subsequent Ninth Circuit cases have without explanation applied the "harmless beyond a reasonable doubt" standard despite, in one case, a vigorous dissent. *See, e.g.*, *United States v. Doe*, 219 F.3d 1009, 1014 (9th Cir. 2000) ("*Doe IV*") (the final question is "was the violation harmless to the juvenile beyond a reasonable doubt?" (quoting *Doe II*, 862 F.2d at 779)); *D.L.*, 453 F.3d at 1120 (same); *see also id.*, 453 F.3d at 1134 (Alarcon, J., dissenting). We therefore follow that standard, despite its dubious origin.

parents of the arrested juvenile and inform them of the juvenile's rights and custodial status, and of the nature of his alleged offense. *Id.* In the case of an alien juvenile whose parents live outside the United States, if it proves impossible to contact the juvenile's parents with reasonable efforts, the consulate of his home country may instead be contacted. *D.L.*, 453 F.3d at 1122. Third, the juvenile must be brought before a magistrate judge "forthwith" and "[i]n no event shall the juvenile be detained for longer than a reasonable period of time before being brought before a magistrate judge." 18 U.S.C. § 5033.

**[21]** The government has not contended, either before the district court or on appeal, that it provided R.P. any of the protections of § 5033, instead maintaining throughout that R.P. was not entitled to any such protections. In particular, the government has not contested R.P.'s assertion, in his opening brief on appeal, that "there is no factual dispute that none of the procedures outlined in the JDA were followed after [R.P.] was placed in custody." Given R.P.'s legal and factual representations and the absence of any opposing government argument that § 5033 was complied with if it applies, we conclude that the provisions of § 5033 were violated.[15] *See United*

---

[15]Even had the government argued that it did provide R.P. the protections of § 5033, it likely could not meet its burden of demonstrating compliance. The Border Patrol Agents acknowledged that they made no effort to contact either R.P.'s parents or the Mexican consulate. Moreover, we have held that a delay of as little as 3.5 hours does not comport with the requirement that a juvenile be advised of his rights "immediately." *Doe IV*, 219 F.3d at 1014. R.P. was arrested at approximately 5 or 5:30 p.m. Agent Salazar testified that he read R.P. his rights sometime "after midnight," immediately before interrogating him, and read his rights to him "roughly" four hours earlier as well. Although the exact timing of the first *Miranda* warning remains unclear, R.P. was likely not informed of his rights "immediately" as required by the JDA. Finally, although we have acknowledged that certain extraordinary factors may excuse a reasonable delay in bringing a juvenile before a magistrate, *see Doe III*, 701 F.2d at 823-24, in the absence of any such explanation, a delay of as little as eleven hours is unacceptable. *C.M.*, 485 F.3d at 502. In this case, it appears that R.P. was arraigned not less than 36 hours after his arrest.

*States v. Almazan-Becerra*, 482 F.3d 1085, 1090 (9th Cir. 2007) (holding that government waived an alternative argument when it did not raise it in its response brief or before the district court).

Having determined that § 5033 was violated in every respect, we turn to the issue of prejudice. This circuit "has adopted a two-step test for determining prejudice." *RRA-A*, 229 F.3d at 747. We must first assess whether any of the violations of the JDA were a cause of R.P.'s statement to Agent Salazar. *Id*. If so, the second step is to determine whether R.P. was prejudiced by his statement. *Id*. Whether violations of § 5033 contributed to a juvenile's confession is "a factual question to be explored on remand." *Doe II*, 862 F.2d at 781. A juvenile not provided any of the protections of § 5033 experiences "isolation from family, friends, and representatives of [his] country," confusion as to his rights, and a lengthy delay before being taken before a magistrate judge. *See RRA-A*, 229 F.3d at 747; *see also C.M.*, 485 F.3d at 503 (quoting *Doe II*, 862 F.2d at 781). The protections of § 5033 were formulated on the assumption that failure to provide them is likely to lead to coercive interrogations of juveniles, so the burden is on the government to show lack of causation when every provision of § 5033 was violated. *See, e.g.*, *United States v. Lopez*, 500 F.3d 840, 845 (9th Cir. 2007) ("The burden of proving a constitutional error harmless beyond a reasonable doubt rests upon the government."); *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1100 (9th Cir. 2005) (holding that "it is the government's burden to show the harmlessness of the error" where the district court committed nonconstitutional evidentiary error). The district court on remand will need to determine whether the government can meet that burden in this case.

[22] We remand to the district court, because we are not convinced beyond a reasonable doubt that the confession, if caused by the violation of the JDA, was harmless. "In assessing harmlessness, we must be convinced beyond a reasonable

doubt that the government's misconduct did not give rise to any prejudice." *C.M.*, 485 F.3d at 503 (citing *Wendy G.*, 255 F.3d at 767). A defendant is prejudiced by his confession if his statements are a major part of the proof of the crime at trial. *RRA-A*, 229 F.3d at 747 (holding that there was prejudice when the "confession was the primary basis of evidence on which [defendant] was convicted"); *Doe IV*, 219 F.3d at 1018 (holding there was prejudice where the statement was the "sole source of proof of his knowledge of the drugs").

**[23]** R.P.'s statement was "the primary basis of evidence" that he intended to gain financially and that he knew there were smugglers who were receiving money to transport the aliens. *See RRA-A*, 229 F.3d at 747. The district court found with regard to the financial gain counts that "pursuant to [R.P.'s] own statement . . . [R.P.] agreed to drive others to reduce his smuggling fee." In the absence of R.P.'s statement, there would be insufficient evidence to sustain a finding of delinquency with regard to the § 1324(a)(2)(B)(ii) counts. Unlike in previous cases that have found sufficient circumstantial evidence of financial gain, R.P. could have had other, non-pecuniary reasons for driving the truck as he also wished to enter the United States illegally, and the government presented no other evidence of his association with smugglers. *See, e.g.*, *United States v. Schemenauer*, 394 F.3d 746, 751 (9th Cir. 2005) (holding that there was sufficient evidence of financial gain where the defendant was a United States citizen, was personally connected to the smuggler, and admitted knowledge that the smuggler was involved in smuggling activities, and the defendant had no non-pecuniary motive for his actions); *United States v. Yoshida*, 303 F.3d 1145, 1152 (9th Cir. 2002) (holding that the evidence was sufficient to support the conclusion that the defendant intended to gain financially because the defendant had no possible non-pecuniary motive for his actions); *United States v. Angwin*, 271 F.3d 786, 805 (9th Cir. 2001) (there was sufficient evidence of financial gain in a case involving a United States citizen who smuggled aliens because of the "lack of any other

possible explanation for [his] conduct"), *overruled on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc)). We are thus not "convinced beyond a reasonable doubt" that R.P.'s confession was harmless with respect to the financial gain counts. *See C.M.*, 485 F.3d at 503. If the district court concludes that the government's violations were a cause of R.P.'s confession, the juvenile delinquency finding as to these counts must be vacated and the confession suppressed.

With regard to Counts Two, Four and Six (violations of § 1324(a)(2)(A)(ii)), there was additional evidence from which the district court could have found that R.P. had knowingly transported illegal aliens. For example, the border patrol officers testified that they saw R.P. driving a truck carrying illegal aliens, and R.P. attempted to flee. Although there was other substantial evidence, the district court specifically relied on R.P.'s statement for the conclusion that "he knew the others in the car were undocumented aliens." Given the persuasiveness of a confession from a defendant and the fact that it was specifically relied upon by the district court, however, we cannot conclude "beyond a reasonable doubt" that the district court would have reached the same verdict absent the confession. *Cf. E.E.O.C. v. Farmers Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994) (holding that any error in admission of testimony in bench trial was harmless in light of the fact that judge specifically stated that he did not rely on contested testimony); *Dep't of Water & Power v. Okonite-Callender Cable Co.*, 181 F.2d 375, 382 (9th Cir. 1950) (holding that an error in admitting evidence during a bench trial was not prejudicial where the findings and opinion of trial court clearly showed that the court was not influenced by that evidence). Consequently, on remand, if the district court concludes that the violations of § 5033 caused the confession, it must determine whether, on the trial record but with the confession excluded, R.P. is a juvenile delinquent as to Counts Two, Four, and Six. *See Wright v. Southwest Bank*. 554 F.2d 661, 664 (5th Cir. 1977) (vacating the judgment of the district court where it

relied on inadmissible evidence, and remanding to permit it to correct the evidentiary error).

**[24]** R.P. argues that the appropriate remedy in this case, assuming the violations of § 5033 were a cause of the confession, is not merely suppression of his confession on remand, but dismissal of the information. We have in some cases exercised our discretion to dismiss an information when it is apparent that the confession formed the basis for the information. *See, e.g.*, *C.M.*, 485 F.3d at 504 (holding that where the "government's reliance on the fruits of its misconduct to initiate proceedings against [Defendant] was not harmless beyond a reasonable doubt[,] . . . [t]he appropriate remedy . . . [is] . . . to dismiss the charges."). In this case, however, R.P. was found driving a truck of undocumented aliens near the United States border and attempted to flee the police. Several undocumented aliens were detained and provided testimony that they had paid for transportation across the border. It is almost certain that R.P. would have been charged with transportation of undocumented aliens for financial gain even in the absence of his confession. *See Doe II*, 862 F.2d at 781 (suggesting that, where Border Patrol agents actually saw the juvenile behind the wheel of a car transporting illegal aliens, "it [was] logical for them to start the criminal process in motion"). In this case, assuming the violations of § 5033 were a cause of R.P.'s confession, the appropriate remedy "to ensure that the prophylactic safeguard for juveniles not be eroded or neglected" would be vacation of the juvenile delinquency findings and suppression of R.P.'s confession, *Wendy G.*, 255 F.3d at 765. A new trial in which the confession is not considered would not be precluded as to any of the six counts.

**[25]** Accordingly, we remand to the district court so that it may determine whether the violation of § 5033 in this case caused R.P.'s confession. If the district court determines that § 5033 caused R.P.'s confession, it must suppress the evidence of the confession, vacate the conviction as to Counts One, Three, and Five, and consider whether a judgment of

acquittal is required as to Counts Two, Four, and Six in light of the remaining admissible evidence in the record.

We therefore **AFFIRM** the district court's decision with regard to §§ 5032 and 5036 of the JDA, **REVERSE** the district court's holding that § 5033 was not violated, and **REMAND** for proceedings not inconsistent with this opinion.[16]

---

BERZON, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion with the exception of the conclusion that a remand is necessary to determine whether the violations of § 5033 were a cause of R.P.'s confession. In some cases, whether violations of § 5033 contributed to a juvenile's confession may be "a factual question to be explored on remand." *United States v. Doe*, 862 F.2d 776, 781 (9th Cir. 1988) ("*Doe II*"). Here, however, the government has never disputed R.P.'s allegation that the failure to provide the benefits of § 5033 contributed to his confession. Nor has the government argued that, were we to hold that § 5033 was violated, a remand would be necessary to determine whether any violations of § 5033 contributed to R.P.'s confession. Indeed, government counsel refused to make such an argument even when invited to do so at oral argument.

The government's failure to argue for remand on the causation issue is well-advised. Section 5033 sets three requirements for the interrogation of juveniles: (1) advising the juvenile of his rights immediately; (2) notifying the juvenile's parents immediately; and (3) taking the juvenile before a

---

[16]As we remand for a determination of whether R.P.'s confession was caused by the violations of § 5033, we do not reach the district court's denial of R.P.'s motion under Rule 29(a), nor do we reach the question whether the district court erroneously relied on hearsay testimony.

magistrate judge "forthwith." 18 U.S.C. § 5033. In every juvenile confession case in which all three of the requirements of § 5033 were violated, this court has concluded that those violations contributed to the confession. *See United States v. C.M.*, 485 F.3d 492, 503-04 (9th Cir. 2007) (holding that failure to advise juvenile of her rights immediately, to notify the juvenile's parents or the consulate, and to arraign a juvenile promptly were a cause of juvenile's confession); *United States v. D.L.*, 453 F.3d 1115, 1115 (9th Cir. 2006) (same); *United States v. Juvenile (RRA-A)*, 229 F.3d 737, 747 (9th Cir. 2000) (same); *United States v. Doe*, 219 F.3d 1009, 1017-18 (9th Cir. 2000) (same). *Cf. Doe II*, 862 F.2d at 780-81 (remanding for determination of whether failure to notify juvenile's parents or the consulate and failure to arraign juvenile promptly caused his confession where juvenile did not allege that he was not promptly notified of his rights). A juvenile not provided *any* of the protections of § 5033 experiences "isolation from family, friends, and representatives of [his] country," confusion as to his rights, and a lengthy delay before being taken before a magistrate judge. *See RRA-A*, 229 F.3d at 747; *see also C.M.*, 485 F.3d at 503 (quoting *Doe II*, 862 F.2d at 781). The protections of § 5033 were formulated on the assumption that failure to provide them is likely to lead to coercive interrogations of juveniles. At the least, in those cases in which none of the protections were provided there is no basis for holding that the violations did not contribute to the confession.

As the majority acknowledges, the burden is on the government to show lack of causation. The government has not suggested that it could meet this burden. I therefore conclude that in light of the government's position and the complete lack of compliance with § 5033, no remand on the causation question is necessary. I would therefore reverse the juvenile delinquency determination on Counts One, Three, and Five.