**UNITED STATES of America, Plaintiff,**

v.

**C.L.T., Defendant**

**3:16–CR–30041–RAL**

United States District Court, D. South Dakota, Central Division.

Signed 09/09/2016

---

Meghan N. Dilges, U.S. Attorney's Office, Pierre, SD, for Plaintiff.

OPINION AND ORDER GRANTING MOTION TO TRANSFER CASE TO JUVENILE COURT AND SEALING CASE

ROBERTO A. LANGE, UNITED STATES DISTRICT JUDGE

Defendant C.L.T.[1] was indicted on March 15, 2016, on one count of aggravated sexual abuse of a child and two counts of abusive sexual contact of a child by force. Doc. 1. All counts allege that C.L.T. committed the offenses "[o]n or about or between the 1st day of August, 2013, and the 31st day of May, 2015," in Indian country in the District of South Dakota. Doc. 1. The alleged victim of the aggravated sexual abuse and on one count of the abusive sexual contact is C.L.T.'s young niece A.C., while the alleged victim on the remaining charge of abusive sexual contact is his even younger niece S.W.

■ C.L.T. filed a Motion to Transfer Case to Juvenile Court, Doc. 29, arguing that the only time he possibly could have committed such offenses was before the date range in the indictment, which was before he turned 18 and therefore was a juvenile. C.L.T. was born in late March of 1995, and was indicted in this case before his 21st birthday. The indictment alleges a 22 month time span when C.L.T. would have been between 18 and 20 years of age.

---

1. This Court uses initials for the defendant here due to its conclusion that the case ought to be transferred to juvenile court, but the opinion and order should be publicly available due to the dearth of case law in this realm.

The government opposed C.L.T.'s motion to transfer. Doc. 32.

The Federal Juvenile Delinquency Act requires juveniles not be prosecuted in federal court, absent a certification process. 18 U.S.C. § 5032. Because C.L.T. was under the age of 21 when indicted, whether C.L.T. was 18 or younger than 18 at the time of the commission of any offense is a jurisdictional barrier to whether he can be tried as an adult.[2] See United States v. Ceja–Prado, 333 F.3d 1046, 1048 (9th Cir. 2003). Relatively few cases address the burdens and standard of proof to use in determining a defendant's juvenile status. United States v. Juvenile Male, 595 F.3d 885, 896–97 (9th Cir. 2010) (per curiam) ("There is a paucity of cases addressing the appropriate allocation of the burdens and standard of proof in a hearing to determine juvenile status "). The statute itself is silent on such issues. See 18 U.S.C. § 5032. Both C.L.T. and the government cite to United States v. Salgado–Ocampo, 50 F.Supp.2d 908 (D. Minn. 1999), for the applicable standard. Doc. 30 at 12; Doc. 32 at 4. In Salgado–Ocampo, on remand from the Eighth Circuit to determine the defendant's juvenile status based on conflicting claims as to the defendant's date of birth, the district court reasoned that an initial burden fell on the government to

> offer prima facie evidence of defendant's adult status. If the government satisfies this burden, defendant must then come forward with evidence of his juvenile status. If the defendant comes forward with such evidence, the government has an opportunity to rebut with any additional information.

Id. at 909.

■ The first disagreement between the parties is whether the indictment itself constitutes prima facie evidence of the defendant's adult status. An indictment represents the grand jury's determination of probable cause. Kaley v. United States, — U.S. —, 134 S.Ct. 1090, 1097, 188 L.Ed.2d 46 (2014) ("[A]n indictment fair upon its face, and returned by a properly constituted grand jury, we have explained, conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged." (alteration in original and internal quotes removed) (quoting Gerstein v. Pugh, 420 U.S. 103, 117 n.19, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975))); see also United States v. Allen, 406 F.3d 940, 946 (8th Cir. 2005) (en banc) (noting that one of the "primary purposes of the grand jury [is] ... to make 'the determination whether there is probable cause to believe a crime has been committed' " (quoting United States v. Calandra, 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974))). This indictment alleges that C.L.T. committed the crimes on or between about August 1, 2013, and May 31, 2015. Doc. 1. C.L.T.'s date of birth is not in question; it is in March of 1995. Under these circumstances, the indictment constitutes prima facie evidence of C.L.T.'s adult status at the time of the alleged offenses. See, e.g., Beavers v. Henkel, 194 U.S. 73, 85, 24 S.Ct. 605, 48 L.Ed. 882 (1904) (holding "the indictment is prima facie evidence of the existence of probable cause" in habeas corpus cases seeking removal to another district); Moore v. Hartman, 571 F.3d 62, 67 (D.C. Cir. 2009) (affirming and collecting cases from many districts determining an indictment constitutes prima facie evidence of probable cause in Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), retaliatory prosecution claims); see also Zike v. Advance Am., Cash Advance Ctrs. of Mo.,

---

**2.** The government has not indicated that it would seek to transfer the case back to adult court under 18 U.S.C. § 5032.

Inc., 646 F.3d 504, 510 (8th Cir. 2011) (recognizing that the Missouri Supreme Court has determined that when grand jury indicts, there is prima facie evidence of probable cause in malicious prosecution cases).

The next disagreement between the parties is whether, once C.L.T. comes forward with evidence of juvenile status, the government's burden to rebut that evidence and show adult status is by a preponderance of the evidence, as the government contends, or beyond a reasonable doubt, as C.L.T. argues. Doc. 30 at 13; Doc. 32 at 5. The weight of authority establishes that the government's ultimate burden to rebut evidence of defendant being a juvenile is by a preponderance of the evidence. See United States v. Garcia-Flores, No. 88–5470, 1991 WL 17448, at *3 (9th Cir. Feb. 15, 1991); Salgado–Ocampo, 50 F.Supp.2d at 909; State v. Arot, 838 N.W.2d 409, 412 (N.D. 2013); People of the V.I. ex rel J.G., 59 V.I. 347, 362–64 (V.I. 2013); State v. Ali, 806 N.W.2d 45, 54 (Minn. 2011); People v. Nguyen, 222 Cal. App.3d 1612, 272 Cal.Rptr. 523, 526 (1990) (interpreting a state statute); In re R.L., No. FJ–06–1777–07, 2008 WL 5123000, at *2 (N.J. Super. Ct. App. Div. Dec. 8, 2008) (per curiam) (same). These cases offer only sparring explanation for the reasoning beyond the standard, but such a standard makes sense in juvenile status cases. See, e.g., Ali, 806 N.W.2d at 54 ("[B]ecause the criminal defendant and the State have an equal interest in trying the defendant in the proper court, preponderance of the evidence is the proper standard of proof . . . ."). A preponderance of the evidence standard regarding juvenile status makes sense. Otherwise, a defendant who committed a crime at a time when it was unclear whether he was over or under 18 could avoid prosecution altogether simply by showing reasonable doubt existed as to whether he was over or under 18 at the time of the offense. With a preponderance of the evidence standard, the Court has an opportunity to decide whether the weight of evidence supports trying a defendant as an adult or juvenile. Moreover, burden shifting, like that used in Salgado–Ocampo, generally employs the preponderance of the evidence standard. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (applying a burden shifting approach using the preponderance of the evidence standard in a discrimination suit); United States v. 7725 Unity Ave. N., 294 F.3d 954, 958 (8th Cir. 2002) (applying a burden shifting approach using the preponderance of the evidence standard in civil forfeiture cases); United States v. Wallace, 845 F.2d 1471, 1473–75 (8th Cir. 1988) (approving a burden shifting approach using the preponderance of the evidence standard in civil commitment cases where the defendant has been acquitted by reason of insanity in prior criminal case). But see United States v. Davis, 260 F.3d 965, 968–69 (8th Cir. 2001) (approving a burden shifting framework relating to nonqualifying felonies in sentencing that used a preponderance of the evidence standard for the existence of the felonies, but a clear and convincing evidence standard once the burden shifted to the defendant to prove they were nonqualifying).

The remaining issue is a factual one— whether the government has shown by a preponderance of the evidence that C.L.T. was at least 18 when the criminal acts allegedly occurred. This Court held an evidentiary hearing on August 22, 2016, to hear testimony and receive evidence from both sides on that issue. The matters set forth below represent this Court's understanding of the facts using a preponderance of the evidence standard, do not otherwise reflect factual findings, and are not meant to imply that C.L.T. is anything other than presumed innocent at this time.

In January of 2016, Bureau of Indian Affairs Special Agent Tino Lopez received a call from S.W.'s mother to report an allegation of sexual abuse by C.L.T. Special Agent Lopez then met with S.W.'s mother as well as the mother of A.C. Those two mothers are C.L.T.'s older sisters; C.L.T. is the uncle of A.C. and S.W. The two mothers apparently reported that their daughters had disclosed that C.L.T. had done something sexual to them.

On January 14, 2016, Angela Lisburg, a family nurse practitioner at the Central South Dakota Child Assessment Center, met separately with A.C. and then S.W. Lisburg is a trained and experienced forensic interviewer of children and used accepted protocols to conduct separate videotaped forensic interviews of A.C. and S.W. that day.[3]

A.C., who was 10 in January of 2016, was emotional and initially reluctant to explain what happened. A.C. ultimately described her uncle C.L.T. having her touch and put in her mouth his "private part" when C.L.T. was babysitting her, S.W., and other children at S.W.'s house in S.W.'s mother's bedroom. A.C. identified on a diagram the private part as being in the groin. A.C. at one point said that C.L.T. babysat her and S.W. at S.W.'s house only one time, although A.C. described being with C.L.T. on various other occasions. A.C., when asked how old she was, responded that she was "8 or 9." Lisburg did not probe further at that time into how A.C. knew how old she was, or if A.C. associated C.L.T.'s conduct with a time of year, grade, or memorable event in A.C.'s life.

S.W. was 8 when interviewed by Lisburg in January of 2016. S.W. was able to express herself more clearly than A.C. S.W. described that C.L.T. made her touch his "private part" in her mother's bedroom when C.L.T. was watching her, A.C., and others at S.W.'s home. S.W. circled on a diagram of a man the groin area as the private part. S.W. said that she was present when C.L.T. had A.C. touch his private part. In response to Lisburg's question, S.W. said that she was 7 when this occurred. Lisburg did not ask further questions of S.W. about who her teacher was at the time, what time of year it was, or any event of significance in S.W.'s life that occurred near in time.

Special Agent Lopez interviewed C.L.T. about the circumstances of his contact with A.C. and S.W. Lopez then asked Lisburg to conduct a second interview of A.C. and S.W. to probe further how old they were when the disclosed sexual assaults occurred. Lisburg separately interviewed S.W. and then A.C. on February 5, 2016. S.W. said in this "extended interview" that she was 6 or 5 at the time. Lisburg sought to clarify or reconcile S.W.'s answer of 6 or 5 with her prior response that she had been 7 at the time. S.W. responded that she was 7 or 6 or 5 at the time of the encounter at issue with C.L.T. S.W. remembered living in a green house when the "touching" with C.L.T. happened, thought she was in second grade, and identified her second grade teachers by name. S.W. remembered that C.L.T. came over to watch them when it was dark and windy outside during the school year. At the end of the interview, S.W. said that the touching occurred when she was in second grade with the teacher who took over after her first teacher died.

A.C. seemed less cooperative and responsive in the second interview. A.C. shrugged her shoulders when Lisburg asked her directly if she was 8 or 9 at the

---

**3.** This Court viewed the videotaped forensic interviews and extended interviews introduced at the hearing.

time of C.L.T.'s sexual assault of her. When asked by Lisburg who her teacher was at the time, A.C. eventually said that she was in second grade in Crow Creek, South Dakota, and gave the name of her teacher at the time. If A.C. was in second grade at the time, she would have been younger than 8 or 9, allowing for the possibility that C.L.T. was a juvenile.

Children of the age of A.C. and S.W. can be reliable reporters of events, especially traumatic events. However, children of such an age can struggle with being able to remember a time an event occurred or how old they were at that time. If A.C. and S.W. accurately recounted their ages when the events occurred in their first forensic interview, then the alleged events occurred after C.L.T. was 18. If A.C. was accurate about being in second grade and if S.W. was 5 (and not 6 or 7), then C.L.T. might have been a juvenile at the time of the alleged sexual assaults. The grade level reports of S.W. and A.C. as to when C.L.T. sexually abused them while babysitting are not reconcilable in the second interview because S.W. is two years younger than A.C. and was not in second grade at the same time A.C. was in second grade in Crow Creek.

The mothers of A.C. and S.W., who are C.L.T.'s older sisters, testified about when C.L.T. babysat A.C. and S.W. S.W.'s mother testified that C.L.T. babysat S.W. beginning when S.W. was 3 or 5. S.W.'s mother communicated with C.L.T. to arrange for him to babysit by Facebook messages. S.W.'s mother provided copies of those messages to the government. According to S.W.'s mother, the last such message was from January of 2013, and she did not need C.L.T. to babysit thereafter because a niece came to live with her in or around February of 2013. C.L.T. was 17 in January of 2013, and did not turn 18 until March of 2013. S.W.'s mother believed that the last time C.L.T. had babysat both S.W. and A.C. together was when she and A.C.'s mother were together for a bachelorette party in November of 2012.

A.C.'s mother testified that she and A.C. moved to Oacoma, South Dakota after A.C. completed second grade in Crow Creek in May of 2014. C.L.T. babysat sparingly for A.C. in Crow Creek, and the only time A.C.'s mother recalled C.L.T. babysitting both A.C. and S.W. was during the bachelorette party. When A.C. and her mother lived in Crow Creek, they either lived with C.L.T. and his mother in a home near where S.W. and her mother lived, or lived nearby.

It is possible that A.C. and S.W. were correct in their initial forensic interviews about when the claimed event occurred and C.L.T. was thus not a juvenile at the time. However, it is more likely that A.C. cannot with any degree of confidence recall how old she was when such things occurred. S.W. is more certain about being 7 and in second grade at the time, but at one point thought she may have been as young as 5. It is possible that one or both of C.L.T.'s sisters influenced A.C. or possibly even S.W. to alter what they said during the extended interview, although S.W.'s demeanor and answers indicate that she was not unduly influenced. It is more likely that these two mothers—the ones who learned from their daughters and who disclosed the reported sexual abuse to Special Agent Lopez—did not prompt their daughters to modify their statements about when the reported sexual touching occurred. It is impossible to peg an exact date of any alleged sexual abuse, although it is possible that the events took place in November of 2012, when C.L.T. babysat both A.C. and S.W. when their mothers were at a bachelorette party. The burden of the government is by a preponderance of the evidence to rebut evidence that C.L.T. was a juvenile at the time of the

unlawful conduct, and that burden has not been met here.

■ C.L.T. has admitted that the doctrine of judicial estoppel bars him from asserting, later in this case, that he must have been an adult when the alleged sexual assaults occurred. That is, he is prevented from taking the conflicting position that he must have been a juvenile now and then later asserting that he must have been an adult. "Judicial estoppel is an equitable remedy fashioned 'to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" United States v. Smith, 574 F.3d 521, 527 (8th Cir. 2009) (quoting New Hampshire v. Maine, 532 U.S. 742, 749–50, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)). The Eight Circuit has accepted the doctrine of judicial estoppel for use in criminal cases. See Smith, 574 F.3d at 527; United States v. Grap, 368 F.3d 824, 830–31 (8th Cir. 2004); see also State v. St. Cloud, 465 N.W.2d 177, 179–80 (S.D. 1991) (finding defendant judicially estopped from claiming he was an Indian in state court criminal proceeding after successfully having his federal court proceeding dismissed by claiming he was not an Indian).

For good cause, it is hereby

ORDERED that the Motion to Transfer Case to Juvenile Court, Doc. 29, is granted and that this matter is now so transferred and considered to be a juvenile case.